**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

|  |  |
|---|---|
| RAYMOND SCHMIDLIN and JULIET SCHMIDLIN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br>  v.<br><br>RAYMOND JAMES FINANCIAL, INC., RAYMOND JAMES & ASSOCIATES, INC., RAYMOND JAMES FINANCIAL SERVICES, INC. and RAYMOND JAMES FINANCIAL SERVICES ADVISORS, INC.,<br><br>    Defendants. | Case No. 8:24-CV-02041-KKM-CPT<br>(Consolidated) |

**<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PARTIES .................................................................................................... 4

II.  JURISDICTION AND VENUE ............................................................... 8

III.  RAYMOND JAMES'S CASH SWEEP ACCOUNT MISCONDUCT .................. 9

B.  Raymond James Acknowledges the Importance of Its Cash Sweep Program ................................................................................................ 13

C.  Raymond James's Cash Sweep Balances Were in the Tens of Billions of Dollars ............................................................................................... 15

D.  Raymond James Owes Several Independent Duties and Obligations to Its Clients .............................................................................................. 16

1.  Raymond James Owes Fiduciary Duties to Its Clients ................... 20

2.  Raymond James's Duties Under Regulation Best Interest (Reg. BI) ......................................................................................... 21

3.  Raymond James Owes Fiduciary Duties as It Acts as Its Clients' Agent Regarding the Cash Sweep Program ..................................... 24

4.  Raymond James Has a Contractual Obligation to Make Reasonable Arrangements Regarding Its Clients' Cash Balances in Qualified Retirement Accounts ....................................................................... 25

5.  Raymond James Has a Contractual Obligation to Pay and Secure Reasonable Interest Rates for All Clients ....................................... 27

6.  Raymond James Has a Contractual Obligation to Base Its Sweep Account Interest Rates on Prevailing Economic and Business Conditions ....................................................................................... 28

7.  Raymond James's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Raymond James to Provide Clients with a Reasonable Rate of Interest ............................................................ 29

E.  Raymond James Used Its Affiliated Banks, RJ Bank and TriState Bank, to Siphon Net Interest Income from the Billions of Dollars of Clients' Cash Sweep Deposits ........................................................................... 30

F.    Raymond James Established Unreasonably Low Interest Rates on the Billions of Dollars Its Clients Held in Cash Sweep Accounts ................... 30

G.    Raymond James Has Unjustly Enriched Itself by Paying Unreasonably Low Interest Rates on Its Clients' Bank Sweep Deposits .................................... 33

H.    The Cash Sweep Program Benefits Raymond James and Its Affiliates, But Not Its Customers ..................................................................................... 37

I.    Raymond James Breached Its Duties, Contracts and the Implied Covenant of Good Faith and Fair Dealing, and Profited Thereby............................... 38

J.    Raymond James Secured and Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits ....................................................................... 41

1.    Sweep Account Rates Paid by Other Institutions............................. 42

2.    The Federal Funds Rate Benchmark ................................................ 46

3.    The Interest Rates on Sovereign Short-Term Debt Benchmark....... 48

4.    The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements .................................................................. 50

CLASS ACTION ALLEGATIONS.................................................................................. 51

FIRST CLAIM FOR RELIEF Breach of Contract Brought on Behalf of Plaintiffs and the Class Against All Defendants ................................................................................ 57

SECOND CLAIM FOR RELIEF Breach of the Implied Covenant of Good Faith and Fair Dealing Brought on Behalf of Plaintiffs and the Class Against All Defendants............... 58

THIRD CLAIM FOR RELIEF Breach of Fiduciary Duty Brought on Behalf of Plaintiffs and the Class Against All Defendants ........................................................................ 59

FOURTH CLAIM FOR RELIEF Unjust Enrichment Brought on Behalf of Plaintiffs and the Class Against All Defendants .............................................................................. 60

DEMAND FOR RELIEF ................................................................................................ 61

JURY TRIAL DEMAND ................................................................................................ 62

1.      This consolidated class action arises out of Raymond James's drastic under-payment of interest to its clients in its cash sweep programs.  Raymond James underpaid its clients in violation of its fiduciary and contractual duties in order to enrich itself at its clients' expense.  Rather than pay its clients a "reasonable rate" of interest on their cash that properly took into account "prevailing economic and business conditions," as Raymond James was required to do, Raymond James instead paid de minimis rates to its clients while it earned hundreds of millions of dollars on that cash in periods of rising interest rates.

2.      In a typical cash sweep program for a brokerage client, the brokerage firm, acting as its client's agent with respect to the cash sweep program, automatically transfers cash from the client's brokerage account into an interest-bearing bank deposit account that generates returns for the client.  However, when Raymond James sweeps its clients' cash through its cash sweep programs, Raymond James uses that cash to generate returns primarily for itself rather than its clients, due to the spread between the interest income that Raymond James earns on the cash and the amount of interest that it pays its clients.

3.      As an agent of its clients with respect to its cash sweep programs, Raymond James is required to act as a fiduciary in the best interests of its clients in connection with those programs. That includes a duty to put its clients' interests ahead of its own when recommending and/or conducting transactions for them,

including transactions within the scope of its cash sweep programs. In addition, under the law, the agreement between Raymond James and its clients carries with it an implied covenant of good faith and fair dealing.

4.    Rather than act as a fiduciary in the best interests of its clients with respect to its cash sweep program or fulfill its contractual and implied covenant obligations to its clients, Raymond James used its clients' funds to enrich itself at their expense.

5.    Raymond James underpaid interest to sweep account clients, including by controlling and increasing the profits to itself by channeling its clients' cash sweep deposits to affiliated—rather than an independent third party—banks. This included Raymond James's use of its subsidiaries, Raymond James Bank, N.A. ("RJ Bank") and TriState Capital Bank ("TriState Bank"), to funnel cash from its clients' accounts to RJ Bank and TriState Bank[1] through its bank sweep programs to thereby capture even greater profits from the programs. In the recent years of higher interest rates, Raymond James's interest income skyrocketed due to the clients' swept cash, resulting in massive profits.

---

[1] According to a press release dated July 27, 2022 announcing Raymond James's third quarter 2022 results, Raymond James reported that, on June 1, 2022, it completed the acquisition of all outstanding shares of TriState Capital Holdings, Inc., including its wholly owned subsidiary TriState Bank, and thereafter, renamed the "Raymond James Bank segment" to "Bank segment."

6.     Periods of rising interest rates presented an opportunity for Raymond James's clients to earn more on their cash sweep account balances.  By improperly keeping the interest rates paid by RJ Bank and TriState Bank on cash sweep accounts artificially low, however, Raymond James usurped that opportunity for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself.

7.     In setting Raymond James's cash sweep interest rates—which Raymond James has kept largely static over the past several years—Raymond James ignored market conditions.  For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year.  By contrast, for years the vast majority of Raymond James's clients with cash sweep accounts have only been paid interest rates of 0.01% to 0.20%.

8.     There is nothing reasonable or fair about the rates Raymond James secured for, and paid to, its clients with cash sweep accounts, or about Raymond James using its clients' cash balances to reap windfall profits.

9.     Nor does Raymond James set its sweep interest rates based on competitive interest rates. Indeed, brokerages that do not sweep their cash to **affiliated** banks (as Raymond James does) pay their clients far higher interest rates than Raymond James does.

10.    Raymond James's misconduct constituted and continues to constitute an ongoing series of breaches of its fiduciary duties, an ongoing series of breaches

of its contracts with accountholders, and an ongoing series of breaches of the implied covenant of good faith and fair dealing. Indeed, it was particularly harmful to Raymond James's clients who, like all other Americans, have suffered through record inflation over the past few years. Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by Raymond James's misuse of its cash sweep programs to enrich itself at the expense of its clients.

## I.    PARTIES

### A.    Defendants

11.    Defendant Raymond James Financial, Inc. ("RJF") is a financial services firm based in the U.S. with operations worldwide. RJF is a holding company that conducts business through its subsidiaries, including Defendants RJA, RJFS, RJFSA, and RJ Trust, and non-parties RJ Bank and TriState Bank. RJF is a Florida corporation with its headquarters in this District at 888 Carillon Parkway, St. Petersburg, Florida. Further, RJF, "together with its subsidiaries, is engaged in various financial services activities, including providing investment management services to retail and institutional clients . . . ." Through its wholly-owned subsidiaries, RJF provides financial consulting, wealth management, and advisory services to Plaintiffs and other Class members, and it substantially assisted, directed,

participated in, and received the benefits of the wrongful conduct alleged herein conducted by RJFS and RJFSA.

12.     Defendant Raymond James & Associates, Inc. ("RJA") is a Florida corporation headquartered in this District. RJA is a full-service broker-dealer and investment advisor registered with the SEC.  It is a wholly-owned subsidiary of RJF.

13.     Defendant Raymond James Financial Services, Inc. ("RJFS") is a registered broker-dealer.  RJFS is the registered broker-dealer for client accounts, but it does not hold client assets or settle trades with counterparties. RJA executes and clears all transactions for RJFS, and RJA has custody of all RJFS accounts.

14.     Defendant Raymond James Financial Services Advisors, Inc. ("RJFSA") is a registered investment advisor with the SEC and provided advisory services to Plaintiffs.  RJFSA is a Florida corporation with its principal place of business within this District.

15.     Defendant Raymond James Trust Company of New Hampshire ("RJ Trust"), established in 2021, is a wholly owned subsidiary of RJF and acts as custodian, in partnership with financial advisors, for all Raymond James individual retirement accounts (IRAs).  RJ Trust is a nationally chartered trust company, chartered by the Office of the Comptroller of the Currency.  RJ Trust provides trustee, co-trustee, custodial, personal representative, and agent-to-trustee services to clients of its broker-dealer affiliates.  For all IRAs, including Plaintiffs' IRA

accounts, RJ Trust acts as the custodian and RJA as the sub-custodian. In its capacity as custodian, RJ Trust was a "disqualified person" under 26 U.S.C. § 4975(e)(2) and, based on the statutory language, had a duty to ensure that all IRA account holders received a reasonable rate of interest on their cash sweep balances. RJF is the 100% owner of RJ Trust and as such, is also a "disqualified person" under Section 4975(e)(2)(G)(i). As a disqualified person, RJF had a duty to ensure that all IRA accounts received a reasonable rate of interest on their cash sweep balances.

16.    As used in this Complaint, the term "Raymond James" collectively refers to RJF, RJA, RJFS, RJFSA, and RJ Trust.

### B.    Plaintiffs

17.    Plaintiff Raymond Schmidlin was at all relevant times a customer of Defendants and is a resident and citizen of Ohio. He maintained a SEP IRA account with Raymond James in which cash was held over the course of the life of the account for which RJ Trust served as the custodian, and RJA served as the sub-custodian. Mr. Schmidlin's cash balances held in his account were swept into the Cash Sweep Program (defined below) during the period when his accounts were open, and he received unreasonably low interest on those deposits.

18.    Plaintiff Juliet Schmidlin was at all relevant times a customer of Defendants and is a resident and citizen of Ohio. She maintained both an individual Raymond James brokerage account in which cash was held over the course of the

life of the account, and a Raymond James traditional IRA account in which cash was held over the course of the life of the account. RJ Trust served as the custodian for Ms. Schmidlin's IRA account, and RJA serves as the sub-custodian of the account. Ms. Schmidlin's cash balances held in both of her accounts were swept into the Cash Sweep Program, and she received unreasonably low interest on those deposits.

19.    Plaintiff Toni Conran was at all relevant times a customer of Defendants and is a resident of Florida. She maintained a traditional IRA account with Defendants. RJ Trust serves as the custodian for Ms. Conran's IRA account. Ms. Conran is also the Trustee of the Conran Family Trust, which was created July 12, 2012, and maintained a retail brokerage account with RJFS. Ms. Conran opened both accounts in 2016 and closed them both in 2024. While she was a customer, Ms. Conran's cash balances held in her Raymond James accounts were swept into the Cash Sweep Program during the period when her accounts were open, and she received unreasonably low interest on those deposits.

20.    Plaintiff Cynthia Laube was at all relevant times a customer of Defendants and is a resident of Minnesota. She maintained a traditional IRA account with Defendants. RJ Trust serves as the custodian for Ms. Laube's IRA account. While she was a customer, Ms. Laube's cash balances held in her Raymond James accounts were swept into the Cash Sweep Program during the period when her accounts were open, and she received unreasonably low interest on those deposits.

### C.    Relevant Non-Parties

21.    Non-party RJ Bank is a Florida-chartered bank and is RJF's principal bank subsidiary.

22.    Non-party TriState Bank is a Pennsylvania-chartered bank and, since June 1, 2022, a wholly-owned bank subsidiary of RJF.

## II.    <u>JURISDICTION AND VENUE</u>

23.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

24.    The Court has personal jurisdiction over Defendants because RJF maintains its principal place of business and headquarters in this District at 888 Carillon Parkway, St. Petersburg, Florida, regularly transacts business in Florida through its wholly-owned subsidiaries, including Defendants RJA and RJFS, and thus has minimum contacts in Florida and in this District.

25.    Venue is proper under 28 U.S.C. § 1391 because, among other things, Defendants maintain their headquarters in this District, have offices in this District, and a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiffs' claims occurred in this District.

## III.    RAYMOND JAMES'S CASH SWEEP ACCOUNT MISCONDUCT

### A.    Raymond James's Cash Sweep Program

26.    The Raymond James Bank Deposit Program is the cash sweep program offered by Defendants to customers, including Plaintiffs and the proposed Class (the "RJBDP" or the "Cash Sweep Program").  The RJBDP has two versions, one that has the affiliated RJ Bank as the only bank option (referred to as "RJBDP-RJ Bank Only") and another option that allows the customer to choose from a list of other participating banks.  The customers' returns from the Cash Sweep Program are the same across all participating banks, whether affiliated or not.

27.    In addition, Defendants offer a cash feature called the Client Interest Program ("CIP") under which, if the client selects that feature in an eligible account, the sweep accounts pay clients the same interest rate they receive if they selected RJBDP. The CIP is not part of this case and is not at issue here.

28.    A client's account type determines which of the sweep options are available under the Cash Sweep Program:

      a.    Non-Retirement Account Options:  RJBDP, RJBDP-RJ Bank Only, or CIP.

      b.    Accounts subject to ERISA; SEP IRAs, SIMPLE IRAs, and SARSEPs; and any other IRAs in Advisory Accounts:  RJBDP-RJ BankOnly.

c. IRAs (other than SEP IRAs, SIMPLE IRAs, and SARSEPs) in non-Advisory Accounts (i.e., brokerage IRAs): RJBDP or RJBDP-RJ Bank Only.  If a brokerage IRA account that utilizes RJBDP becomes an Advisory Account, you agree that account will no longer be eligible for RJBDP, and instead will utilize RJBDP-RJ Bank Only upon becoming an Advisory Account.

29.    The relationship between Defendants and their customers, including Plaintiffs, is set forth in the Master Client Agreement ("RJ Master Client Agreement").  The RJ Master Client Agreement provides a website link to important disclosures about the Cash Sweep Program, including those contained in documents titled "Important Client Information" and "Important Information And Disclosures About Your Raymond James Account" (together with the RJ Master Client Agreement, "Program Agreement").

30.    The RJ Master Agreement and Program Agreement incorporates the rules of applicable federal, state, and self-regulatory organizations, including the SEC and FINRA, and the parties are therefore bound by them.

31.    The RJ Master Client Agreement contains a choice of law provision that provides, in relevant part, that these agreements shall be governed by, and enforced under, the laws of the State of Florida.

32.    The Program Agreement sets forth how customers' uninvested cash is automatically "swept" from the customers' account into FDIC-insured deposit accounts with banks that are affiliated with Defendants – i.e., RJ Bank, TriState Bank – and/or third-party banks that are not affiliated with Defendants (collectively, "Participating Banks").

33.    The unaffiliated third-party Participating Banks pay RJA an amount equal to a percentage of the swept cash not to exceed the Federal Funds Target Rate, plus a 75-basis points kicker. The RJA-affiliated Participating Banks pay RJA an administrative fee of up to $100 per account in addition to a percentage of the swept cash.  In return, RJA pays its customers a nominal amount in the form of interest and keeps the rest.

34.    The Program Agreement states that for the "[r]ate determination process for client cash swept through RJBDP to banks other than RJ Bank and TriState Capital Bank," "[t]he interest rates on the deposit account will be determined by the amount the banks are willing to pay on balances in the deposit accounts."

35.    The Program Agreement states that for the "[r]ate determination process for client cash swept through RJBDP to RJ Bank," "RJ Bank sets the rates that it will pay for each Interest Rate Tier, and any client whose cash sweeps to RJ Bank under RJBDP will receive that interest rate."

36.    The Program Agreement also states that for the "[r]ate determination process for client cash swept through RJBDP to TriState Capital Bank," "TriState Capital Bank sets the rates that it will pay for each Interest Rate Tier, and any client whose cash sweeps to TriState Capital Bank under RJBDP will receive that interest rate."

37.    However, the interest rate is determined by what Defendants (including banks controlled by Raymond James) decide to pay their customers from the pool of money that the banks pay to Defendants.

38.    Raymond James also previously offered money market fund sweep options to customers.  On May 22, 2019, in a footnote to the April 2019 Operating Data press release, Raymond James disclosed that the money market fund sweep options will no longer be available, and the vast majority of the balances in the money market fund sweep options will be converted to the [RJBDP]," effective in June 2019.  Market analysts estimated that doing so would allow Raymond James to "benefit from the higher [net interest margin] on cash sweep deposits vs sweep money market funds."  Market analysts further noted that converting the money market fund sweep option to RGBDP would result in a "1%-4%" increase in earnings per share.

39.    Even though the average client balance in the Cash Sweep Program is estimated to be $8,900, the aggregate total of Raymond James cash sweep balances

is staggering.  As of September 30, 2024, the total domestic client cash sweep balances in the Raymond James Cash Sweep Program were *$42.2 billion*.  Indeed, market analysts have reported that the "key" to Raymond James "is cash sweep."

### B. Raymond James Acknowledges the Importance of Its Cash Sweep Program

40.     Raymond James' filings with the SEC, earnings reports, and RJF's senior executives' statements to stock market analysts repeatedly acknowledged the importance of the Cash Sweep Program to Raymond James operations.

41.     For example, in connection with its May 25, 2023 Analyst and Investor Day, Raymond James acknowledged that:

> The Raymond James Bank Deposit Program in PCG *provides most of the firm's funding*.

42.     Similarly, Raymond James annual report on Form 10-K for the fiscal year ending September 28, 2018 filed with the SEC on November 21, 2018 ("2018 Form 10-K") acknowledged:

> *We rely heavily on bank deposits as a low-cost source of funding for RJ Bank* to extend loans to clients and purchase investment securities. *Our bank deposits are primarily driven by our multi-bank sweep program* in which clients' cash deposits in their brokerage accounts are swept into FDIC-insured interest-bearing accounts at RJ Bank and various third-party banks. A significant reduction in our domestic clients' cash balances, a change in the allocation of that cash between RJ Bank and third-party banks, or a transfer of cash away from RJF, could impact our net revenues and our ability to fund RJ Bank's growth.

* * *

13

> ***A significant portion of our clients' cash is included in our RJBDP****. . .*
>
> * * *
>
> ***Recent short-term interest rate increases by the Fed had a significant impact on fees earned from third-party banks in RJBDP****. . .*
>
> * * *
>
> ***As a result, RJBDP fees have increased significantly over the prior years****...*

43.   According to the 2018 Form 10-K:

> In our brokerage operations, ***a rising interest rate environment generally results in our earning a larger net interest spread and an increase in fees received on our multi-bank deposit sweep program****. . .*

44.   Similarly, on January 24, 2019, RJF Chief Financial Officer ("CFO") Jeff Julien acknowledged in an analyst conference call following the release of Raymond James' 2019 Q1 financial results that:

> The only other item on the revenue side that was - came in significantly ahead of projections was the net interest earnings. We did have a pretty significant surge in client cash balances, about $5.75 billion in the sweep balances for the quarter. That obviously fueled some of this net interest earnings.

45.   In its second quarter report on Form 10-Q for the quarter ending June 30, 2019, filed with the SEC on August 8, 2019, Raymond James noted that "[a] significant portion of our clients' cash is included in our RJBDP [Cash Sweep Program.]"

### C.    Raymond James's Cash Sweep Balances Were in the Tens of Billions of Dollars

46.    The amount of Raymond James' customers' cash swept into the RJBDP was consistently in the tens of billions of dollars.  For example, as of the end of 2018 Q4 ending September 30, 2018, the balance in the RJBDP was reported at $35.010 billion, with $19.446 billion held at RJ Bank, and $15.564 held at third party banks.[2]

47.    By the end of Q4 2019 ending September 30, 2019, the balance in the RJBDP was reported at $35.692 billion, with $21.649 billion held at RJ Bank, and $14.043 held at third party banks. Raymond James October 23, 2019 press release announcing its fourth quarter and fiscal 2019 results also revealed that "[m]oney market funds were discontinued as a sweep option during the third fiscal quarter of 2019. Balances in those funds were converted to RJBDP or reinvested by the client."

48.    By the end of Q4 2020 ending September 30, 2020, the balance in the RJBDP was reported at $55.597 billion, with $25.599 billion held at RJ Bank, and $25.998 held at third party banks.

49.    By the end of Q4 2021 ending September 30, 2021, the balance in the RJBDP was reported at $55.906 billion, with $31.410 billion held at RJ Bank, and

---

[2] The balances in the RJBDP were reported in Raymond James filings with the U.S. Securities and Exchange Commission ("SEC"), and earnings press releases available at https://www.raymondjames.com/investor-relations (last accessed January 8, 2025).

$24.496 held at third party banks.  On an analyst conference call following the release of its 2021 Q4 results, RJF CFO Paul Shoukry acknowledged:

> Clients' domestic cash sweep balances, which are the primary source of funding for our interest-earning assets and the balances with third-party banks that generate RJBDP fees ended the quarter at ***a record $66.7 billion, up 6% over the preceding quarter*** and representing 6.3% of domestic PCG client assets.[3]

50.    By the end of Q4 2022 ending September 30, 2022, the balance in the RJBDP was reported at $60.669 billion, with $38.705 billion held at Raymond James "Bank segment,"[4] and $24.496 held at third party banks.

51.    By the end of Q4 2023 ending September 30, 2023, the balance in the RJBDP was reported at $41.213 billion, with $25.355 billion held at Raymond James Bank segment, and $15.858 held at third party banks.

52.    By the end of Q4 2024 ending September 30, 2024, the balance in the RJBDP was reported at $42.204 billion, with $23.978 billion held at Raymond James Bank segment, and $18.226 held at third party banks.

### D.    Raymond James Owes Several Independent Duties and Obligations to Its Clients

53.    Raymond James has numerous fiduciary, contractual, and implied duties to its own clients with respect to its Cash Sweep Program, including to put its

---

[3] The $66.7 billion cash sweep balance included $10,672 billion held in the CIP that is not at issue here.

[4] As of June 1, 2022, Raymond James Bank segment was renamed "Bank segment" and consisted of RJ Bank and TriState Bank.

clients' best interests ahead of its own, to pay clients a "reasonable rate" of interest on their cash sweep balances, and to take into account "prevailing economic and business conditions" when setting interest rates paid to clients.

54.    Raymond James has repeatedly recognized the existence of these duties but acted in ways directly contrary to them by appropriating for itself the profits that belong to its own clients.

55.    For example, the Program Agreement states that clients selecting RJBDP-RJ Bank Only are authorizing the deposit of their cash balances in deposits issued by RJ Bank, which will bear a ***reasonable rate of interest*** (as required by 29 C.F.R. Section 2550.408b-4(b)(2)).

56.    Raymond James's obligation to secure for, and pay, its clients a reasonable rate of interest on their cash sweep balances also included an obligation to properly take into account prevailing economic and business conditions.

57.    The Program Agreement, in the Important Client Information section, under a heading "Interest rate to be received by Clients" provides that accounts "enrolled in RJBDP, RJBDP-RJ Bank Only, and CIP each utilize the ***same Interest Rate Tiers and pay the same rate of interest*** on the cash balances within each Interest Rate Tier." That same section goes on to state that "***interest rates will vary based upon prevailing economic and business conditions.***"

58.    As a registered investment adviser and broker-dealer, and acting as an agent for its clients with respect to the Cash Sweep Program, Raymond James owes fiduciary duties to its clients as well as express contractual obligations and obligations implied as a matter of law.

59.    Raymond James is a registered investment adviser bound by the fiduciary duties imposed by the Investment Advisers Act of 1940, including duties of care and loyalty.  This includes a duty for Raymond James to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest.  Similar duties are imposed on Raymond James under principles of broker-dealer law and as an agent of its clients in connection with its Cash Sweep Program.

60.    For all advisory accounts, Raymond James was contractually obligated to pay to or secure for its clients a "reasonable rate of interest" on the clients' cash balances.

61.    For all advisory (or managed) accounts (including advisory IRAs), Raymond James was required to act as a fiduciary to its clients with respect to all aspects of the accounts, including the Cash Sweep Program, pursuant to the Investment Advisers Act of 1940.

62.    For all accounts, Raymond James agreed to act as "agent" for its clients with respect to the Cash Sweep Program, and, as a result, Raymond James was

required to act as a fiduciary for its clients as its principal with respect to the Cash Sweep Program.

63.   In addition, Raymond James is bound by the implied covenant of good faith and fair dealing to secure for, and pay, its clients with sweep accounts a fair and reasonable rate of interest.

64.   Raymond James contracted with its clients that the interest rate on its Cash Sweep Program deposits would be based on prevailing economic, market, and business conditions.

65.   Raymond James breached its express and implied contractual duties and fiduciary duties to its clients by failing to pay to, or secure for, them a fair and reasonable rate of interest on their cash sweep balances.  Raymond James further breached its express and implied contractual duties and fiduciary duties to its clients by, among other things: (i) structuring the Cash Sweep Program to place client assets in the Cash Sweep Program and secure for, and pay, clients artificially low interest rates so as to benefit Raymond James and its affiliates to its clients' detriment; (ii) failing to adjust the interest rates paid on sweep account balances to properly take into account prevailing economic, market, and business conditions as marked by increased interest rates in the industry and, including, as paid by brokerages with sweep accounts that swept cash to non-affiliated banks; and (iii) failing to properly

take into account competitive interest rates when setting sweep account interest rates.

### 1.    Raymond James Owes Fiduciary Duties to Its Clients

66.    As an investment adviser for its clients, Raymond James must adhere to certain standards of care and conduct.

67.    Specifically, for its advisory clients, Raymond James owes its clients a fiduciary duty under the Investment Advisers Act of 1940, which is based on equitable common law principles and fundamental to its relationship with its clients. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

68.    Under this fiduciary duty, Raymond James "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

69.    Raymond James's fiduciary duties also include a duty of care to carry out its responsibilities in an informed and considered manner and to act as an ordinary prudent person would act in the management of his or her own affairs. In addition, because Raymond James is a fiduciary on the basis of claimed special skills

or expertise, it is under a duty to use those skills and expertise for the benefit of its clients.

70.    Raymond James acknowledges this fiduciary relationship on its website, which states:

> When we act as an investment adviser to you, we are generally considered to have a fiduciary relationship with you under the Investment Advisers Act of 1940 and applicable state laws. Applicable rules and regulations generally require that:
>
> - We act in what we reasonably believe to be your best interests based on your stated financial situation and investment objectives. . . .

### 2.    Raymond James's Duties Under Regulation Best Interest (Reg. BI)

71.    Where Raymond James is acting in its capacity as a broker-dealer, it is obligated to act in its clients' "best interests" under Reg. BI. 17 C.F.R. § 240.15l-1.

72.    Reg. BI incorporates "key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail customers." 84 Fed. Reg. 33318, 33320. Reg. BI and common law principles of fiduciary obligations "generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[5]

---

[5] SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations (June 7, 2024), available at http://www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

73.    Under Reg. BI, regardless of whether an investor chooses a broker-dealer or an investment adviser (or both), the investor "will be entitled to a recommendation … or advice … that is in the best interest of the retail investors and that does not place the interests of the firm or the financial professional ahead of the interests of the retail investor."  84 Fed. Reg. 33318, 33321.

74.    Reg. BI consists of a "General Obligation," which states, "When making a recommendation, a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests."  84 Fed. Reg. 33318, 33320.

75.    Part of a broker-dealer's obligation under Reg. BI is to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation."  84 Fed. Reg. 33318, 33321.

76.    Pursuant to Reg. BI, Raymond James was required to act in the best interests of its clients when recommending an account type to its clients, including "understanding of the characteristics of a particular type of account [and] should consider, without limitation, factors such as the services and products provided in

the account (including ancillary services provided in conjunction with an account type)."[6]

77.    The SEC recently reiterated that compensation, revenue, and other benefits from cash sweep programs give rise to a conflict of interest for both broker-dealers and investment advisers.[7]

78.    Raymond James's default placement of Plaintiffs' and other Class members' cash into the Sweep Programs constitutes a "recommendation" within the scope of Reg. BI, and as a result, Raymond James was required to act in the best interests of its client when making that recommendation.

79.    Under Reg. BI, Raymond James was and is obligated to elevate its clients' interests above its own, and to avoid and mitigate conflicts with clients' interests.

80.    Raymond James acknowledges the Best Interest standard in its Client Relationship Summary, which states that, "When we provide you with a recommendation as a broker/ dealer or act as your investment adviser, we have to act in your best interest and not put our interest ahead of yours."

---

[6] *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Account Recommendations for Retail Investors (June 7, 2024), available at https://www.sec.gov/tm/iabd-staff-bulletin.

[7] *See* Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflict of Interest (June 12, 2024), available at https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

### 3.    Raymond James Owes Fiduciary Duties as It Acts as Its Clients' Agent Regarding the Cash Sweep Program

81.    Moreover, in creating and operating its Cash Sweep Program, Raymond James also agreed to act as an agent (and therefore a fiduciary) on behalf of its clients in establishing, maintaining, and operating their cash sweep accounts.

82.    The Program Agreement specifically provides that:

- "***RJA will act as your agent*** and custodian in establishing and maintaining the deposit accounts at each participating bank…you will not have a direct relationship with the banks—all deposits and withdrawals will be made by RJA on your behalf."

- "***RJA is acting as your agent*** in establishing the deposit accounts at each bank, depositing funds into the deposit accounts, withdrawing funds from the deposit accounts, and transferring cash among the deposit accounts."

83.    Thus, in light of the express terms of the Program Agreement, RJA was duty-bound to establish, maintain, and operate the Cash Sweep Program in the best interests of its principals, *i.e.*, its customers, such as Plaintiffs and the other members of the proposed Class.    Notwithstanding these obligations, RJA established, maintained, and operated the Cash Sweep Program for its own interests, contrary to the interests of its customers.

84.    Rather than benefit its customers, for whom Raymond James was acting as agent regarding the Cash Sweep Program, Raymond James instead operated the Cash Sweep Program so as to benefit itself and its affiliates.    At the same time RJA

was acting as its customers' agent in connection with the Cash Sweep Program, it was also beholden to its affiliated banks, RJ Bank and TriState Bank.

85.    Accordingly, in its capacity as an adviser, broker, and/or agent in exercising complete control in creating, offering, enrolling, and maintaining cash sweep accounts under the Cash Sweep Program and the rates to be paid thereunder, Raymond James, through RJA, had fiduciary and other duties of loyalty and care to its clients.

86.    Contrary to its duties to its clients, at the same time that Raymond James was supposed to be acting as its clients' agent in connection with the Cash Sweep Program, it was actually acting to advance its own interests, and those of its affiliates, at the expense of its clients.

**4.    Raymond James Has a Contractual Obligation to Make Reasonable Arrangements Regarding Its Clients' Cash Balances in Qualified Retirement Accounts**

87.    For retirement accounts, Raymond James provides that RJ Trust as custodian shall "use all reasonable care, skill, prudence and diligence in the *administration* of the Depositor's Custodial Account."

88.    This contractual provision is required to comply with Section 4975 of the Internal Revenue Code ("IRC").    IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with

a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975(c).

89.    A "disqualified person" includes companies or individuals "providing services to the plan."[8]  26 U.S.C. § 4975(e)(2)(B).  This includes IRA custodians and banks that receive deposits swept from Raymond James client accounts; in this case, Raymond James Bank and other participating banks.

90.    The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4).

91.    Treasury regulations extend this same obligation to situations when "a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates."    26 CFR § 54.4975-6(b)(3)(i).    When this occurs, the client's authorization "must name" the institution and "must state that such bank or similar financial institution may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  *Id.*

---

[8]  "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)."  26 U.S.C. § 4975(e)(1)(B).

92.     Raymond James thus has both legal and contractual duties to act in the best interests of its clients with respect to its Cash Sweep Program and to pay to or secure for its clients fair and reasonable interest rates on its clients' cash balances.

### 5.    Raymond James Has a Contractual Obligation to Pay and Secure Reasonable Interest Rates for All Clients

93.     The Program Agreement, specifically the Important Client Information, requires Raymond James to pay its clients a "reasonable rate of interest" on all cash deposits in the RJBDP-RJ Bank Only cash sweep option.  Thus, Raymond James is contractually obligated to pay a reasonable rate on its clients' cash deposits in the RJBDP-RJ Bank Only.

94.     The Important Client Information also states: "Accounts enrolled in RJBDP, RJBDP-RJ Bank Only, and CIP each utilize the same Interest Rate Tiers and pay the same rate of interest on the cash balances within each Interest Rate Tier." In other words, Raymond James customers receive the same interest rates on their deposit accounts regardless of the Cash Sweep Program in which their accounts are enrolled.  Thus, Raymond James is also contractually obligated to pay a reasonable rate on *all* of its clients' cash deposits in the RJBDP and in the CIP.

6.    **Raymond James Has a Contractual Obligation to Base Its Sweep Account Interest Rates on Prevailing Economic and Business Conditions**

95.    In Raymond James's Important Client Information distributed to its clients, Raymond James states that the interest rates paid on its Cash Sweep Program deposits "*will vary based upon prevailing economic and business conditions.*"

96.    When describing dividend and interest administrative options, Raymond James's Important Client Information also states that sweep accounts will earn "competitive rates of interest":

> Sweeps to Interest-Bearing Accounts. You may prefer to have payments automatically swept into an interest-bearing account, eliminating the need to cash checks or deliver them to another institution for deposit and eliminating possible delays due to "holds" placed on the funds when the checks are deposited in another institution or due to the postal service. In addition, by sweeping your payments into an interest-bearing account, ***you will begin earning competitive rates of interest on them immediately***.

97.    Raymond James's Important Client Information further states, "Interest rates paid on your cash balances **may equal, exceed, or be lower than the prevailing market rates.** The interest rates paid **may be higher or lower than the interest rates available to depositors making deposits directly with a bank** or other depository institution in a comparable account."

98.    RJA also states in the Program Agreement that it offers the Cash Sweep Program "at no additional charge or cost to clients." But there is a substantial cost to RJA's clients through the payment of unreasonably low interest rates, as that

deprives clients of the lion's share of the interest returns on their deposits, and instead those returns are kept by Defendants and their affiliate banks.

99.    Accordingly, pursuant to Raymond James's agreements with its clients, the interest rates paid to clients in Raymond James cash sweep accounts must reflect the prevailing economic and business conditions, and the interest rates paid to clients must be competitive with other interest rates, including, for example, the rates paid by brokerages who sweep cash to non-affiliated banks.

### 7.    Raymond James's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Raymond James to Provide Clients with a Reasonable Rate of Interest

100.    Raymond James's clients' agreements all include an implied covenant of good faith and fair dealing.  This implied covenant includes but is not limited to a duty not to perform the parties' agreement based on an ulterior motive and act in a way that evades the spirit of the bargain.  In this case, that implied covenant included a duty for Raymond James to secure for, and pay, its clients a fair and reasonable rate of interest on their cash sweep balances.

101.    In failing to secure for or pay to its clients a fair and reasonable rate of interest, Raymond James breached the implied covenant of good faith and fair dealing.

**E.    Raymond James Used Its Affiliated Banks, RJ Bank and TriState Bank, to Siphon Net Interest Income from the Billions of Dollars of Clients' Cash Sweep Deposits**

102.    In creating and operating its Cash Sweep Program, Raymond James exercises control over what sweep vehicles it makes available to its clients. Raymond James also exercises control over the setting of the interest rates that its affiliated banks, including RJ Bank and TriState Bank, pay on its clients' cash balances.

103.    As market interest rates increased, Raymond James used its affiliated banks to take advantage of the cash in Raymond James clients' accounts and capture for Raymond James more of the spread between the interest paid to Cash Sweep Program clients and the interest income it could earn using such clients' Cash Sweep Program deposits.

104.    Raymond James operates RJ Bank and TriState Bank to take advantage of the cash in Raymond James clients' accounts, which Raymond James directed through the Cash Sweep Program. Indeed, most of RJ Bank's assets consist of cash deposited by Raymond James as an agent on behalf of Raymond James's clients.

**F.    Raymond James Established Unreasonably Low Interest Rates on the Billions of Dollars Its Clients Held in Cash Sweep Accounts**

105.    The interest rates to be paid to clients pursuant to the Cash Sweep Program are established by Raymond James. Contrary to the terms of Raymond James's agreements with its clients, Raymond James has not secured for or paid its

clients a fair or reasonable rate of interest on their swept cash, and Raymond James in fact ignored or failed to properly take into account prevailing economic and business conditions in setting rates.

106.    For example, and without limitation, since 2022, the Federal Funds Rate—the interest rate at which banks lend to one another—increased significantly from a low of 0.08% to a high of 5.33% in 2024.  However, Raymond James failed to secure and pay increasing interest rates on its clients' swept cash.

107.    In fact, Raymond James maintained nearly flat Cash Sweep Program rates for years, at a fraction of a percent, securing high interest returns for itself on the cash but securing far less than a fair and reasonable rate for its clients—thereby retaining the sharply increased spread for itself.  This is reflected in the graph below, which compares the Federal Funds Rate to Raymond James's Cash Sweep Program interest rate on cash deposits up to $99,999:



108.    As this graph illustrates, Raymond James is able to derive significant profits from having its clients' funds invested in its Cash Sweep Program because Raymond James establishes rates to be paid to its clients that are neither fair nor reasonable—contrary to Raymond James's legal, contractual, and implied duties.

109.    Raymond James's Program Agreement does not specify the applicable interest rates on its cash sweep accounts.  Instead, Raymond James directs clients to a website to obtain current interest rate information.  Over the past several years, Raymond James's cash sweep rates have been set artificially low by Raymond James, including, as discussed below, in comparison to numerous industry benchmarks.  Below is a chart listing examples of the interest rates for certain times periods during the previous four years:

| Relationship Cash Level | 2021 - Nov. | 2022 - May | 2022 – Sept. | 2023 - April | 2024 - May | 2024 - Dec. |
|---|---|---|---|---|---|---|
| Under $25,000 | 0.01% | 0.02% | 0.15% | 0.25% | 0.25% | 0.20% |
| $25,000 - $99,999 | 0.01% | 0.03% | 0.15% | 0.25% | 0.25% | 0.20% |
| $100,000 - $249,999 | 0.01% | 0.05% | 0.25% | 0.50% | 0.50% | 0.20% |
| $250,000 - $499,999 | 0.01% | 0.05% | 0.70% | 1.00% | 1.00% | 0.50% |
| $500,000 - $999,999 | 0.01% | 0.08% | 0.70% | 1.00% | 1.00% | 0.50% |
| $1,000,000 - $2,499,999 | 0.01% | 0.08% | 1.00% | 2.25% | 2.25% | 1.75% |
| $2,500,000 - $4,999,999 | 0.01% | 0.12% | 1.00% | 2.25% | 2.25% | 1.75% |
| $5,000,000 - $9,999,999 | 0.01% | 0.12% | 1.00% | 2.25% | 2.25% | 1.75% |
| $10,000,000 - $24,999,999 | 0.01% | 0.20% | 1.35% | 3.00% | 3.00% | 2.50% |
| $25,000,000 and above | 0.02% | 0.20% | 1.35% | 3.00% | 3.00% | 2.50% |

110.   The vast majority of Raymond James's accounts had balances of less than $100,000 and therefore earned a maximum of 0.25% in interest from the Cash Sweep Program.

## G.     Raymond James Has Unjustly Enriched Itself by Paying Unreasonably Low Interest Rates on Its Clients' Bank Sweep Deposits

111.   Raymond James has derived significant financial benefits for itself from the payment of unreasonably low interest rates on its clients' cash sweep deposits.  For example, and without limitation, as a result of the increasing interest rates in 2022, Raymond James saw a 97% rise in net interest income from the Cash Sweep Program from 2022 to 2023.

112.   RJ Bank and TriState Bank function as a highly profitable arbitrage operation of Raymond James, making it possible for Raymond James to take advantage of the nearly-cost-free cash entrusted to it by its clients pursuant to the Cash Sweep Program, and retaining for itself, through RJ Bank and TriState Bank, the vast majority of the profits generated by its clients' cash deposits.

113.   Raymond James has continued to take advantage of its clients' cash sweep accounts, even as regulatory and industry scrutiny of cash sweep accounts increased, and competitors raised the interest rates paid on cash sweep balances in late 2023 and throughout 2024.

114.   In November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC.  Then, in July 2024, both Wells Fargo and Morgan Stanley announced that they were raising interest rates on cash sweep accounts. Morgan Stanley then announced on August 5, 2024, that the SEC was investigating its "advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."

115.   Despite the increased regulatory scrutiny of sweep accounts and Raymond James's competitors reacting by raising interest rates, Raymond James has failed to increase the interest rates on its Bank Deposit Program for a majority of its clients.

116. Raymond James executives' resistance to increasing sweep account interest rates—in a high-interest rate environment where its competitors were publicly increasing their rates—demonstrates its breach of its fiduciary and contractual obligations to its clients.

117. For example, on Raymond James's first-quarter 2022 earnings call, Chairman & CEO Paul Reilly stated, "***Clients' domestic cash sweep balances grew 10% sequentially to a record $73.5 billion.*** As Paul will detail later in the call, ***we should have significant upside to our pretax earnings in a rising interest rate environment.***" On the same call, CFO Paul Shoukry similarly stated, "[t]his growth in client cash balances should bode well for us in a rising interest rate environment."

118. On Raymond James's third-quarter 2024 earnings call, RJF CFO Shoukry claimed that Raymond James has been generous with offering high interest rates to clients in programs other than the Bank Deposit Program, even in this competitive environment. Specifically, Mr. Shoukry stated:

> There has been some migration and mix shift to the higher yielding programs and initiatives that we've offered, which are actually closer to 5%.
>
> * * *
>
> It'll largely depend on the competitive environment. But because ***we have been generous in passing rates to clients and through these other programs*** that have near money market fund rates like Enhanced Savings Program, etc., we should have a lot of sensitivity to the downside as well in both the asset and on the funding side of things. So, we do feel like we have an ample amount of cushion. But again, ***it'll***

***depend on the competitive environment*** and the demand for cash across the industry as rates go down.

119.    Yet, on the same call, in response to an analyst's question about RJBDP, which the analyst noted "doesn't include potential considerations to maybe changes in rates on sweep cash," Mr. Shoukry stated that the Company had no plans to raise cash sweep interest rates. Specifically, Mr. Shoukry stated, "as of today, we're looking at stuff, but with no current plans" to raise rates.

120.    Raymond James executives have continued highlighting the financial benefits Raymond James derived from cash sweep balances in their public statements. For example, at Raymond James's Investor Day on May 23, 2024, President of Private Client Group Scott Curtis stated, "***Now where do we make money***? You can see the list of numbers here, but ***it comes from our cash sweep***."

121.    At the same event, RJF Chairman & CEO of Raymond James Bank, Steven M. Raney, highlighted the benefits received from the cash sweep program:

> Of the roughly $80 billion of [] assets on the Raymond James Financial balance sheet. A little over $60 billion of those assets are sitting inside of the 2 banks, Raymond James Bank and TriState Capital Bank. . . . ***So we continue to benefit tremendously from this very stable and low-cost funding through our Private Client Group, roughly 1.5 million households, all of who have accounts and virtually every account has some -- at least some small element of cash that's sitting there awaiting investment***.

### H.    The Cash Sweep Program Benefits Raymond James and Its Affiliates, But Not Its Customers

122.    In contravention of the applicable agreements and fiduciary obligations, the Cash Sweep Program primarily benefited Defendants and their affiliates, at the expense of their customers.

123.    The Program Agreement explains:

> Fees paid to RJA by the banks in the Bank Deposit Program provide RJA a material source of revenue. This revenue is important to the ability of RJA to finance its business activities, and ultimately to the potential profitability of RJA. In addition to the fees received by RJA from the banks, cash balances provide a relatively low-cost source of funds . . . and help contribute to our profitability.

124.    The majority of cash in the Cash Sweep Program is deposited with affiliated banks.  According to RJF's Form 10-Q filed with the SEC for the period ended June 30, 2024, $23.371 billion of customers' domestic cash sweep balances in the RJBDP was with affiliated banks, and $17.325 billion was with non-affiliated banks.  According to the Program Agreement, "RJ Bank and TriState Capital Bank benefit by receiving deposits through RJBDP on which each of those banks pays an interest rate that may be less than the cost of other alternative funding sources available to it."

125.    In addition, financial advisors affiliated with Defendants likewise profit from the RJBDP.  As the Program Agreement states, customers "should expect that

Raymond James will share a portion of the revenues it receives from one or more of the sweep options with your [financial advisor]."

126.   As its customers' agent, RJA was bound to act in the best interest of those customers, but failed to do so.  Instead, RJA's customers received unreasonably low interest rates under the Cash Sweep Program.

127.   As its customers' agent, RJA exercises discretion as to the Cash Sweep Program's key features, including the transactions by which it negotiates and establishes the rates of returns for its customers.  RJA exercised this discretion in a manner that paid, and pays, unreasonably low interest rates to its customers in the Cash Sweep Program.  RJA also shifts to its affiliated banks, RJ Bank and TriState Bank, a substantial portion of the beneficial returns on its customers' cash, which would otherwise constitute compensation to its customers in connection with the Cash Sweep Program.

128.   RJA is a fiduciary of its customers in the Cash Sweep Program, and in that capacity was required to put its customers' interests first – not the interest of RJ Bank or other participating banks – while negotiating and entering into transactions with Participating Banks regarding the Cash Sweep Program.

I.    **Raymond James Breached Its Duties, Contracts and the Implied Covenant of Good Faith and Fair Dealing, and Profited Thereby**

129.   Raymond James has breached, and continues to breach, its duties and agreements to secure and pay fair and reasonable interest rates for its clients'

deposits, its contractual agreements that the interest rates would be based on prevailing economic and business conditions, as well as its implied covenant to pay its clients a fair and reasonable rate of interest.

130.   Raymond James has breached, and continues to breach, its duties, its contractual obligations, and the implied covenant of good faith and fair dealing to, and with, its clients by creating and operating its Cash Sweep Program for its own principal benefit, over which Raymond James exercises complete control, all while failing to pay or secure fair and reasonable rates of interest on client cash balances.

131.   Through its legal and contractual duties, Raymond James was obligated, but failed, to: (i) set, secure or pay fair and reasonable interest rates on clients' cash balances deposited in the Cash Sweep Program; (ii) properly take into account prevailing economic, market, competitive, and business conditions in setting rates; and (iii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the Cash Sweep Program.

132.   Raymond James's conduct of failing to pay to or secure for its clients a fair or reasonable rate of interest on their cash balances that properly took into account prevailing economic and business conditions unjustly enriched Raymond James at the direct expense of its clients.

133.   Raymond James and its affiliates gained significant financial benefits from the cash balances swept into its Cash Sweep Program through the spread that

the affiliate banks earn on the Cash Sweep Program deposits, the fees Raymond James received from the Cash Sweep Program Banks, and other incentive arrangements with the affiliate banks that are based, at least in part, on deposit balances and number of accounts in the Cash Sweep Program.

134.   Raymond James's Net Interest Income increased dramatically over the past several years due, in large part, to Raymond James taking improper advantage of its relationships with its clients, appropriating to itself the benefit of the rising interest rate environment, and failing to pass on such benefit to its clients for whom it acted as agent and fiduciary.

135.   The relationships between Raymond James and its clients, the imbalance of negotiating power between Raymond James and its clients, and Raymond James's exercise of control over the interest paid in the Cash Sweep Program are circumstances that create an equitable obligation (in addition to any fiduciary, contractual and/or implied duties) running from Raymond James to its clients.

136.   Raymond James's continual sweep of Plaintiffs' and the other Class members' cash into the Cash Sweep Program during the entire period in which they held accounts with Raymond James while paying them an unreasonably low interest rates constitutes a continuing wrong and was an ongoing and continuing series of

breaches of Raymond James's duties to, and contracts with, Plaintiffs and the other Class members.

**J.    Raymond James Secured and Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits**

137.   Raymond James established, implemented, and maintains the Cash Sweep Program to maximize its profits through increased Net Interest Income by securing for its clients unfair and unreasonably low interest rates from its affiliates RJ Bank and TriState Bank, while appropriating almost all of the interest earned at significantly higher rates for itself.

138.   IRS regulations define an "arm's-length interest rate" as:

> [A] rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

139.   In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

140.   Under these terms, and any reasonable understanding of what a reasonable rate of interest is, Raymond James did not secure for or pay to its clients a reasonable rate of interest, including Plaintiffs and Class members.   Nor did Raymond James base its sweep account interest rates on competitive rates or prevailing economic and business conditions.   This is supported by reference to other leading indicators of interest rates being paid during the relevant time periods.

### 1.   Sweep Account Rates Paid by Other Institutions

141.   The interest rates paid by other brokerages that sweep cash demonstrate that the interest rates paid to Raymond James cash sweep accountholders were not fair or reasonable.   This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, such as Fidelity.

142.   As shown in the graph below, an index of interest rates paid by five brokerages that did *not* sweep client cash balances to a bank affiliated with its own brokerage more closely tracks the movement of the Federal Funds Rate (set forth above) than Raymond James's de minimis cash sweep rates. By contrast, the interest rate that Raymond James paid its clients was much lower during much of the relevant time:



143.   As shown in the above graph, from mid-2018 to 2023, Raymond James sweep rates had minimal movement, even as the sweep rates paid by brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than Raymond James in the beginning of 2020. In addition, starting in mid-2022, Raymond James's sweep rate stayed consistently low with miniscule increases while the rates paid by brokerages that swept cash to unaffiliated banks increased consistent with the market.

144.   Specific firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected the prevailing economic, market, and business conditions, compared to the rates paid by Raymond James.

145.   For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than Raymond James.  At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million).  Raymond James, in contrast, paid 0.25% up to $99,999 as of year-end 2022.

146.   Additional examples of brokerage firms that sweep their clients' cash into accounts with banks that are not affiliated with the firm include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

147.   Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid 2.03% interest (on cash balances up to $1 million).  In comparison, in the same time period, Raymond James paid only 0.25% APY on cash balances up to $99,999.

148.   In addition, the interest rate offered during that same time period by Vanguard on its sweep program was 4.15% regardless of asset tier, and the interest rate offered by Dreyfus was 2.50% regardless of asset tier.

149.    A comparison of Raymond James's sweep account interest rates paid in the Cash Sweep Program to an industry-wide analysis of 300 sweep programs also shows that Raymond James's rates were unreasonably low during the Class Period, and that Raymond James did not base its sweep interest rates on prevailing or current market conditions or competitive rates.  Such analysis shows that, whereas there were times in the past when Raymond James had increased its sweep account interest rates at times when an index of the interest rates for the 300 sweep programs also increased, there were times, including beginning in late 2022 through the present, when Raymond James stopped making any positive changes to its interest rates paid on sweep accounts, even as the index and other comparable benchmarks continued to increase, and the Raymond James rates were below the index.  That was unreasonable and ignored prevailing market and business conditions.

150.    Moreover, the industry-wide index of 300 sweep programs is a conservatively low comparator because: (i) it represents averages across many brokerages, some paying reasonable rates, and many others paying unreasonable rates; indeed, many other brokerage firms have also been sued by customers who alleged that those firms paid unreasonably low interest rates; (ii) other comparators are more appropriate, including when one compares Raymond James to brokerages that sweep to unaffiliated banks (as set forth in the chart above, *see* ¶141); (iii) a comparison with some of Raymond James's competitors who sweep cash to

unaffiliated banks and have not been accused of using unreasonable rates, such as Fidelity Investments, R.W. Baird, WeBull, and Vanguard (*see* ¶¶144-47) shows far larger cash sweep rate discrepancies to the detriment of Raymond James's clients; (iv) Raymond James promised to take into account the current interest rate environment, which includes the Federal Funds Rate, and the Treasury yield, and which was much more favorable than Raymond James's sweep rates offered; and (v) fact and expert discovery will examine and address the appropriate comparators, Raymond James's interest rate methodology and what experts opine was the reasonable rate.

151.   But, as these data show, other brokerage and advisory financial institutions that have cash sweep programs pay significantly higher interest rates than Raymond James did for its own clients.

## 2.    The Federal Funds Rate Benchmark

152.   A number of interest rate benchmarks increased dramatically over the past several years, but Raymond James's rates barely changed (in its asset tiers up to $99,999) or changed by only miniscule amounts (in its higher asset tiers).

153.   Raymond James acknowledges in its Important Client Information the importance of the Federal Funds Target Rate as a benchmark.   The document provides that third party banks participating in the Cash Sweep Program agreed to pay RJA a "fee equal to a percentage of the average daily deposit balance on cash

swept to and held at those banks," and that the "aggregate fee from all banks will not exceed an annual rate equal to the Federal Funds Target Rate, upper limit, plus 75 basis points (0.75%) of all balances in deposit accounts at all non-affiliated banks" in the Cash Sweep Program.[9]

154.    The Federal Funds Target Rate benchmark further demonstrates that the interest rate paid to Cash Sweep Program accountholders was not reasonable and did not properly take into account the prevailing economic and business conditions.  The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions, and is tied to the Federal Funds Target Rate, which is the target interest rate range set by the Federal Open Market Committee.

155.    The Federal Funds Rate increased dramatically in recent years. For example, the effective Federal Funds Rate on August 28, 2024, was 5.33%.  The graph below (the same as reproduced above) shows the Federal Funds Rate over the past several years and the rate paid on the Cash Sweep Program on deposits up to $99,999.  As the comparison shows, the interest rates paid to Raymond James cash

---

[9] *Important Client Information*, Raymond James, at 49 (June 29, 2024).

sweep account holders have been drastically lower and have failed to reflect changes in the market:



156.    The above graph demonstrates that the interest rates Raymond James secured for its clients' sweep accounts were unreasonably low, when considered in light of prevailing economic, market, and business conditions.

### 3.    The Interest Rates on Sovereign Short-Term Debt Benchmark

157.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on Raymond James cash sweep accounts was not reasonable and did not properly take into account the prevailing economic and business conditions. U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks.  They are sold at a discount

to their face value, and when they mature, the investor is paid the face value. Treasury Bills are considered extremely safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

158.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage. As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



159.    During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rate Raymond James paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 4.    The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements

160.    The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than Raymond James's cash sweep account interest rates.  This further demonstrates that the interest rate paid on Raymond James cash sweep accounts was not reasonable and did not properly take into account the prevailing economic and business conditions.

161.    A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

162.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States

ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the cash sweep interest rates offered by Raymond James.

163.   Unbeknownst to Defendants' customers in the Cash Sweep Program, their agent, RJA, enabled RJ Bank and TriState Bank to function as a highly profitable arbitrage operation as to the RJA customers' cash in the Cash Sweep Program, taking advantage of the nearly free cash funneled to it by RJA as agent of its customers pursuant to the Cash Sweep Program, and retaining for itself the vast majority of the profits it generates with that cash, including the customary compensation that RJA shifted to RJ Bank and TriState Bank.

164.   RJA negotiated and entered into transactions regarding the Cash Sweep Program that directly impacted Plaintiff and the proposed Class, and did so while conflicted, putting the interests of its affiliate banks before the interests of its customers. RJA foregoes substantial compensation in connection with the Cash Sweep Program so as to benefit RJ Bank and TriState Bank, instead of its customers to whom Defendants owed a fiduciary duty in connection with the Cash Sweep Program.

## CLASS ACTION ALLEGATIONS

165.   Plaintiffs re-allege and incorporate by reference the allegations set forth above.  Plaintiffs seek certification of the following Class:

> **Clients of Raymond James who had cash deposits or balances in Raymond James's Cash Sweep Program from September 1, 2019 until the unlawful conduct alleged herein ceases.**

166.    Plaintiffs reserve the right to amend the Class if further investigation and discovery indicates that such definitions should be narrowed, expanded, or otherwise modified.

167.    Excluded from the Class are Raymond James and any of its affiliates, legal representatives, employees, or officers.

168.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

## Numerosity
## Rule 23(a)(1)

169.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time.  However, Raymond James provides financial planning and investment-related services nationwide with approximately 8,800 financial advisors and $1.57 trillion in client assets.[10]

---

[10] *By the Numbers*, Raymond James, available at https://www.raymondjames.com/about-us/by-the-numbers (as of September 30, 2024).

170.    Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### Existence and Predominance of
### Common Questions of Law and Fact
### Rule 23(a)(2), 23(b)(3)

171.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a.    whether Raymond James's interest rates paid on its sweep accounts were fair and reasonable;

   b.    whether in setting interest rates to be paid in its sweep accounts Raymond James properly accounted for prevailing economic and business conditions;

   c.    whether Raymond James owed fiduciary duties and other duties of care to the Class, and whether Raymond James violated those duties;

   d.    whether Raymond James breached the contractual terms of its account agreements and other written communications to Class members;

   e.    whether Raymond James breached the implied covenant of good faith and fair dealing;

   f.    whether Raymond James was unjustly enriched by its wrongful conduct;

   g.    whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

       h.      whether and to what extent Class members are entitled to damages and other monetary relief; and

       i.       whether and to what extent Class members are entitled to attorneys' fees and costs.

172.    Raymond James client agreements contain a choice of law provision that provides, in relevant part, that they and their enforcement shall be governed by the laws of the State of Florida.

173.    The Raymond James client agreements also expressly incorporate the rules of applicable federal, state and self-regulatory organizations, including the SEC and the Financial Industry Regulatory Authority ("FINRA").    Specifically, they provide:

> APPLICABLE LAWS, REGULATIONS, AND RESTRICTIONS
> You acknowledge and agree that transactions in your Account are subject to state and federal laws and regulations; the rules, customs, and usages of the applicable exchange, association, market, or clearinghouse; and the customs and usages of individuals transacting business on the applicable exchange, market, or clearinghouse where the transactions occur.

## Typicality
## Rule 23(a)(3)

174.    Plaintiffs' claims are typical of the claims of the Class because they were account holders with Raymond James that were paid unreasonably low interest rates in their cash sweep accounts that did not take into account prevailing economic, market, and business conditions, and were not competitive interest rates.    Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from

the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

## Adequacy of Representation
## Rule 23(a)(4)

175. Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

## Superiority
## Rule 23(b)(3)

176. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

177. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device

provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

178.  Superiority is particularly satisfied in a circumstance such as this where the law of a single state will apply.  Under the uniform contract terms with Raymond James, the law of the State of Florida will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

179.  Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## <u>FIRST CLAIM FOR RELIEF</u>
### Breach of Contract
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

180.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

181.   Defendants' governing documents related to the Cash Sweep Program constitute a binding agreement between Defendants and their accountholders. For example, the RJA Master Client Agreement bears a "Raymond James & Associates, Inc." legend and defines "We," "us," "our," "ours," "the Firm," and "Raymond James" to mean RJA and its affiliates.

182.   The governing documents provide that Defendants will pay to or secure for their clients a rate of interest on cash deposits or balances maintained in the Cash Sweep Program that properly considers prevailing economic and business conditions.

183.   As set forth herein, Defendants failed to pay to or secure for Plaintiffs and Class members an interest rate on their Cash Sweep Program holdings that accounted for prevailing economic and business conditions and Defendants thereby breached the contracts.

184.   Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Class.

## SECOND CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

185.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

186.   Defendants' governing documents related to their accounts constitute a binding agreement with those accountholders.

187.   Implicit in these contracts (all of which incorporated Defendants' Cash Sweep Program disclosure documents, including the Important Client Information), and under Florida law which governs them, is a covenant of good faith and fair dealing, requiring Defendants to deal fairly with their clients, to fulfill their obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain.

188.   Through the implied covenant of good faith and fair dealing, Defendants were obligated to pay to or secure for Class members a fair and reasonable rate of interest on their cash balances; and to properly account for current or prevailing economic and business conditions and competitive interest rates when paying or securing interest rates on their clients' cash sweep balances.   By failing to do so, Defendants breached the implied covenant of good faith and fair dealing.

189.    Defendants' past, continuous, and ongoing breaches of the implied covenant damaged and continue to damage Plaintiffs and the Class.

## THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

190.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein.

191.    Defendants owed fiduciary duties to Plaintiffs and Class members with respect to the Cash Sweep Program.

192.    These duties include, but are not limited to:

    a.    a duty of care;

    b.    a duty of loyalty;

    c.    a duty to act in the best interests of its clients; and

    d.    a duty not to place Raymond James's interests above those of its clients.

193.    Defendants breached the foregoing duties when they (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on their free credit balances that properly took into account prevailing economic and business conditions; (ii) failed to act in the best interests of Plaintiffs and the Class with respect to the Cash Sweep Program; and (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Cash Sweep Program.

194.   Defendants' past, continuous, and ongoing breaches of duties damaged Plaintiffs and the Class.

195.   Defendants knowingly encouraged, directed, participated in, and benefitted from the breaches of fiduciary duty by their affiliates.

196.   RJF is also liable for such breaches, including under the doctrine of respondeat superior, because RJA, RJFS, RJFSA, and RJ Trust, and non-parties RJ Bank and TriState Bank are agents of RJF.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

197.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim in the alternative to the preceding Claims to the extent it is duplicative of any such claim.

198.   As a result of Raymond James's wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

199.   As a result of Raymond James's wrongful conduct, Raymond James was unjustly enriched because, among other benefits, it received significantly greater Net Interest Income than it would have but for its wrongful conduct.

200.   Raymond James appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

201.  It would be inequitable and unjust for Raymond James to retain these wrongfully obtained profits.

202.  Raymond James's retention of these unjustly obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class demand judgment and relief as follows:

a.    certifying the proposed Class and appointing Plaintiffs and their counsel to represent the proposed Class;

b.    awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

c.    awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

d.    awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

e.    awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class demand a trial by jury on all

issues so triable.

DATED: January 8, 2025          Respectfully submitted,


*/s/ Jonathan M. Stein*
**STEINLAW FLORIDA, PLLC**
**(Of-Counsel to ROSCA SCARLATO LLC)**
Jonathan M. Stein (Fla. Bar No. 9784)
1825 NW Corporate Blvd., Suite 110
Boca Raton, FL 33431
(561) 834-2699
jon@SteinLawFlorida.com
jstein@rscounsel.law

**ROSCA SCARLATO LLC**
Alan L. Rosca, Esq. (OH 84100)
(Admitted pro hac vice)
Jonathan A. Korte, Esq. (FL 126450)
(Admitted pro hac vice)
2000 Auburn Dr. Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
arosca@rscounsel.law
jkorte@rscounsel.law

Paul J. Scarlato, Esq. (PA 47155)
(Admitted pro hac vice)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
pscarlato@rscounsel.law

**WILLIAMS DIRKS DAMERON LLC**
Matthew L. Dameron
(Admitted pro hac vice)
Clinton J. Mann
(Admitted pro hac vice)
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7110
Facsimile: (816) 945-7118
matt@williamsdirks.com
cmann@williamsdirks.com

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
John Rizio-Hamilton
(Admitted pro hac vice)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
johnr@blbglaw.com

***Court-Appointed Interim Class Counsel for***
***Plaintiffs and the Proposed Class***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served upon all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing on this 8th day of January, 2025.

By: /s/ *Jonathan M. Stein*
JONATHAN M. STEIN